[Crim. Nos. 20592, 21412. First Dist., Div. One. Nov. 25, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL D. SEQUEIRA, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Howard-Charles Harpham, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien and William D. Stein, Assistant Attorneys General, John T. Murphy, Ronald E. Niver, Thomas A. Brady and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NEWSOM, J.**—Appellant was charged with numerous counts of robbery (Pen. Code, § 211) and false imprisonment (Pen. Code, § 236), each accompanied by an enhancement clause alleging firearm use (Pen. Code, § 12022.5); he was convicted of some of these charges after a first jury trial, and of others upon retrial. Appellant was sentenced after his second trial to consecutive terms amounting to an aggregate of 21 years and 4 months. Two appeals were filed, one after each trial, which we have consolidated.

The crimes of which appellant was convicted following his first trial related to two separate incidents at the Quarts and Pints Liquor Store in San Francisco occurring on February 10, 1979 (count I) and February 20, 1979 (counts X-XV).

At approximately 7:30 p.m. on February 10, 1979, two men entered the liquor store, exhibited handguns, and ordered everyone in the store, including two clerks and a number of customers, to fall to the floor. One of the gunmen, later identified as appellant, directed the store clerk on duty, Robert Stubblefield, to open the cash register; Stubblefield complied. After Stubblefield had returned to his position on the floor, appellant removed money from the cash register and took some cigarettes from a drawer.

As the two robbers left the store, the victims were ordered to count to 50. Subsequently, an unopened box of Camel cigarettes was found on the floor.[1]

At trial, appellant was identified as a perpetrator of the February 10 robbery by Stubblefield and Michael Burke, an off-duty clerk who was in the liquor store when the robbery occurred. However, none of the customers on the premises at the time of the robbery could identify appellant, and their descriptions did not match appellant's appearance.

On February 20, 1979, Robert Stubblefield was again the clerk on duty at about 7:30 p.m. when two armed men entered the Quarts and Pints Liquor Store. Stubblefield recognized appellant as one of the persons involved in the February 10 robbery. According to Stubblefield,

---

[1]The prosecution offered evidence that appellant often purchased Camel cigarettes from the county jail concession stand after his arrest and incarceration.

appellant stated, "You know the procedure," and then proceeded to remove the clerk's wallet, place him in the beer cooler, and return to the cash register.

A few moments later two customers, Brian Peterson and Dan Dente, entered the store and were placed in the cooler at gunpoint. Money was taken from the wallets of both customers. From the beer cooler, the three witnesses observed the robbers open the cash register. As the robbers left the store, the victims were told to count to 100 before exiting the cooler. Both Stubblefield and Peterson identified appellant as one of the perpetrators of the February 20 robbery.

Four separate San Francisco robberies were the subjects of appellant's second trial.

The first occurred on February 20, 1979, at the Bacon Street Market. On that date, Nimeh Ayyad was working as a cashier in the market—owned by her father—when she observed a man she identified as appellant, and his partner, enter the store, display a pistol, and lead herself, her father and a salesman, Doyle Lambert, to a garage behind the store. While appellant's blond-haired partner guarded the group in the garage, appellant returned to the front of the store. The group was then taken to a walk-in cooler inside the store where they joined Nimeh's mother, brother and a beer salesman. All were told to count to 100 before leaving. Both Nimeh Ayyad and Doyle Lambert identified appellant as one of the robbers.

On February 25, 1979, the Miraloma Market, owned by Jeanette Ross and her husband Bernard, was robbed. At approximately 6 p.m. Jeanette was tending the cash register when a man she identified as appellant asked for help locating "Cup-of-Soup"; he subsequently produced a gun and directed Jeanette and the store customers into a meat cooler. After a few minutes, Jeanette was ordered by appellant's blond partner to return with him to open one of the cash registers, which was found to be empty. Jeanette was thereafter returned to the meat cooler where she waited with the remaining victims until the police arrived, whereupon it was found that the cash register had been emptied. Jeanette and two of the customers were able to identify appellant as one of the robbers at trial.

The Central Drugs Pharmacy in San Francisco was robbed by two persons on March 11, 1979, at approximately 5:30 p.m. Rosemary

Knight, the clerk on duty working with pharmacist Jerry Tonelli, testified that a dark-haired gunman, identified by her as appellant, and his blond-haired partner ordered her from behind a cash register and into a pharmacy room along with Tonelli and two customers. Before being taken to the pharmacy room, Tonelli was ordered by appellant to get "Class A" drugs from a locked narcotics drawer in the back room.

Subsequently, Rosemary Knight was removed from the pharmacy room and told to empty the cash register. She removed the currency from the register and gave it to the robbers, whereupon she was returned to the pharmacy room. The victims were then asked for their wallets or money, and were told to count to 100 before leaving.

Both Rosemary Knight and Jerry Tonelli identified appellant as the dark-haired robber at trial, and from photographs. None of the customers could identify appellant.

On March 15, 1979, at about 3 p.m. Mimi Bergantz and Lois Kemp were working at the temporary trailer-office of the Richmond branch of Citizens Savings and Loan when two men with guns entered and announced a holdup. The employees were ordered to lie on the floor, while the robbers emptied the cash drawers. Appellant then asked Ms. Bergantz to open a vault. Thereafter, the robbers emptied the vault, told the employees to count to 100, and fled. Both employees identified appellant as one of the robbers.

Appellant was convicted of count XXXI, robbery, (Pen. Code, § 211) upon retrial. ■ He argues that his right to a timely preliminary hearing on that charge—within 10 days of arraignment or entry of plea—pursuant to Penal Code section 859b[2] was denied, requiring reversal of the conviction.

The facts pertinent to this issue are as follows: The proceedings involving count XXXI were initiated by a complaint filed in municipal court on April 10, 1979, and on April 17, 1979, appellant appeared

---

[2]At all times herein relevant, section 859b provided: "Both the defendant and the people have the right to a preliminary examination at the earliest possible time, and unless both waive that right or good cause for a continuance is found as provided for in Section 1050, the preliminary examination shall be held within 10 court days of the date the defendant is arraigned or pleads, whichever occurs later. In no instance shall the preliminary examination be continued beyond 10 court days from such arraignment or plea whenever the defendant is in custody at the time of such arraignment or plea and the defendant does not personally waive his right to preliminary examination within such 10 court days."

with counsel and entered a plea of not guilty to all counts. A preliminary hearing was originally set for May 2, 1979. However, on April 26, 1979, the district attorney filed a notice of motion to consolidate the action with another proceeding pending against appellant. Since the preliminary hearing on the latter proceeding was set for May 22, 1979, the district attorney also sought a continuance of the first action.

The motion for consolidation and continuance was scheduled for hearing on April 30, 1979, but was continued to May 3—the date originally set for preliminary hearing—because appellant was in the hospital. On May 3, 1979, appellant announced his readiness to proceed with the preliminary hearing on the original complaint. The district attorney, however, was not prepared for a preliminary hearing, and consequently, the magistrate declared: "The People can't proceed so I'm going to have to discharge the defendant on these charges."

Thereafter, the district attorney filed a new complaint against appellant containing the same charges. Appellant was arraigned on that complaint on May 14, 1979. Preliminary hearing was held on May 31, 1979—within 10 court days of his arraignment on the second complaint—but 35 court days after arraignment on the original complaint. He moved for discharge at the preliminary hearing, and again after being held to answer moved for a section 995 dismissal in superior court, on grounds that the 10-day limitation of section 859b was violated. Both motions were denied.

We are thus presented with the question of whether the 10-day requirement of section 859b relates back to the filing of an initial complaint and arraignment or runs from the date of refiled complaint on the same charge after discharge or dismissal of the original criminal action.

The answer is found in the recent decision of our high court in *Landrum* v. *Superior Court* (1981) 30 Cal.3d 1 [177 Cal.Rptr. 325, 634 P.2d 352],[3] where the court considered the issue in a factual context es-

---

[3]Prior to *Landrum*, a split of authority was found in appellate decisions on this issue. (Cf. *Simmons* v. *Municipal Court* (1980) 109 Cal.App.3d 15 [167 Cal.Rptr. 608]; *Johnson* v. *Superior Court* (1979) 97 Cal.App.3d 682 [158 Cal.Rptr. 899], with *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 431 [172 Cal.Rptr. 135].

sentially identical to that presented here. Overruling *People v. Peters* (1978) 21 Cal.3d 749 [147 Cal.Rptr. 646, 581 P.2d 651], the court concluded that a magistrate has Penal Code section 1385 dismissal authority. (*Id.*, at p. 14.) From that conclusion, the court reasoned: "Since petitioner received his preliminary examination within 10 court days of his arraignment and plea on the second complaint, there was no violation of section 859b and petitioner was legally committed by the magistrate." (*Id.*, at p. 15.) In accordance with the holding in *Landrum*, we conclude that the trial court did not err in denying appellant's motions for discharge and dismissal of the information.

■ Appellant next argues that the trial court erred in denying his motion to suppress the identification testimony of two witnesses, Robert Stubblefield and Michael Burke. It is appellant's position that the pretrial and in-court identifications of the witnesses were the product of an impermissibly suggestive photo display, necessitating reversal of appellant's convictions on counts I and X through XV.

■ Under the test announced by the United States Supreme Court and adopted by our high court, a violation of due process occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed. 2d 1247, 1253, 88 S.Ct. 967]; *Stovall v. Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *People v. Blair* (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738]; *People v. Thornton* (1974) 11 Cal.3d 738, 762 [114 Cal.Rptr. 467, 523 P.2d 267].) "Whether due process has been violated depends upon the 'totality of the circumstances' surrounding the confrontation." (*People v. Blair, supra*, at p. 659; *People v. Burke* (1980) 102 Cal.App.3d 932, 940 [163 Cal.Rptr. 4].) The burden is on the defendant to show that the identification procedure resulted in such unfairness that it abridged his rights to due process. (*People v. Kilpatrick* (1980) 105 Cal.App.3d 401, 412 [164 Cal.Rptr. 349].)

The factors to be considered in determining whether a lineup is impermissibly suggestive include the opportunity of the witness to view the criminal at the scene of the crime, the witness' degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation, as well as the suggestiveness of the procedure em-

ployed. (*Manson* v. *Brathwaite* (1977) 432 U.S. 98, 114 [53 L.Ed.2d 140, 154, 97 S.Ct. 2243].)

■ We find no support for appellant's claim that the photographic lineup procedures denied him due process. The photographs themselves are not suggestive; most in fact depict persons not significantly dissimilar from appellant in appearance. And, the testimony of Inspector Ryan reveals a concerted effort by that officer to compile a fair photo spread. Finally, both Burke and Stubblefield had ample opportunity to observe appellant during the commission of the crimes; Stubblefield, in fact, was the victim of two separate robberies.

We conclude that the totality of circumstances does not indicate a substantial likelihood of irreparable misidentification from the pretrial photographic display. (*People* v. *Rist* (1976) 16 Cal.3d 211, 217 [127 Cal.Rptr. 457, 545 P.2d 833]; *People* v. *Hicks* (1971) 4 Cal.3d 757, 764 [94 Cal.Rptr. 393, 484 P.2d 65]; *In re Charles B.* (1980) 104 Cal.App.3d 541, 545 [166 Cal.Rptr. 729]; *People* v. *Dudley* (1978) 81 Cal.App.3d 866, 870 [146 Cal.Rptr. 767].)

■ Appellant next complains that the physical lineup of April 5, 1979, was the fruit of an illegal transportation of his person from San Mateo County—where he was incarcerated pending proceeding on other charges—to San Francisco County jail pursuant to court order.[4] For that reason, appellant submits that the lineup identifications of him by witnesses Brian Peterson and Ute Papendick should have been suppressed, and his convictions of counts X through XV must now be reversed.

Appellant cites no authority for the proposition that an intercounty transport of a prisoner from one jurisdiction to another is unlawful, and does not claim that his removal from San Mateo County and placement in a San Francisco lineup was not based upon sufficient cause. To the contrary, it appears that the San Francisco police officers who took appellant into custody, transferred him to their jurisdiction and placed him in a physical lineup, had reasonable cause to believe that appellant had committed a felony based upon prior photo-identifications by witnesses.

The declaration by an assistant district attorney which supported the request for appellant's transfer to San Francisco County stated that ap-

---

[4]The court order authorizing transfer and production of appellant for a precomplaint lineup was granted upon request of the police department and a supporting affidavit.

pellant was a suspect in numerous bank robbery cases and his presence at a police lineup was required. The order directed San Mateo County officials to deliver appellant to San Francisco police inspectors for pretrial lineup proceedings, and declared that appellant would be returned forthwith upon the conclusion of those proceedings.

The authority of San Francisco County Superior Court to compel appellant's transfer to its jurisdiction and appearance at a lineup upon a showing of sufficient cause is indisputable. Code of Civil Procedure section 187—applicable to both civil and criminal proceedings (*People v. Walker* (1948) 33 Cal.2d 250, 265 [201 P.2d 6]; *People v. Hyde* (1975) 49 Cal.App.3d 97, 101 [122 Cal.Rptr. 297])—specifies that trial courts are vested with all the means necessary to carry their jurisdiction into effect.[5] Pursuant to section 187, the courts have the inherent authority to adopt any suitable mode of exercising their jurisdiction, and may adopt any order appropriate for that purpose. (*People v. Hyde, supra,* at pp. 102-103.) Here, the trial court's order transferring appellant to its jurisdiction to participate in a lineup was a proper exercise of its authority under section 187 to "carry into effect" a criminal proceeding against appellant.

We also find authority for the trial court's order in section 1567 of the 'Penal Code, which states: "When it is necessary to have a person imprisoned in the State prison brought before any court, or a person imprisoned in a county jail brought before a court sitting in another county, an order for that purpose may be made by the court and executed by the sheriff of the county where it is made. Such order shall be signed by the judge or magistrate and sealed with the seal of the court, if any . . . ." Section 1567 authorizes a trial court to order a prisoner before it from another jurisdiction for the benefit of the court and for any lawful purpose. (*People v. Burns* (1932) 128 Cal.App. 226, 230 [16 P.2d 1015]; *People v. Groves* (1923) 63 Cal.App. 709, 713 [219 P. 1033].) If the court can order a prisoner to its jurisdiction for purposes of trial pursuant to section 1567, a fortiori it also has the authority to cause a prisoner to be brought before it for a pretrial proceeding such as a lineup.

---

[5]Section 187 of the Code of Civil Procedure provides: "When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."

We further conclude that appellant cannot complain that the seizure of his person was unlawful. As a prisoner, he suffered no infringement of a reasonable expectation of privacy or of his due process rights by reason of a custodial transfer from one county to another for placement in a lineup. (*Montayne* v. *Haymes* (1976) 427 U.S. 236, 243 [49 L.Ed. 2d 466, 471-472, 96 S.Ct. 2543]; *People* v. *Case* (1980) 105 Cal.App. 3d 826, 835 [164 Cal.Rptr. 662].) And without any showing by him that the order was not issued upon proper cause, we find, as in the case of a search warrant, that appellant has not met his burden of establishing any defect in the order. (*People* v. *Duncan* (1974) 40 Cal.App.3d 940, 952 [115 Cal.Rptr. 699]; *People* v. *Pipkin* (1971) 17 Cal.App.3d 190, 194 [94 Cal.Rptr. 595].)

Appellant also challenges the pretrial physical lineup on grounds he was denied his right to counsel under the federal and state Constitutions. He acknowledges that, since he had not been formally charged in San Francisco County when the lineup was conducted, at that time he had no right to counsel under established federal law. (*Kirby* v. *Illinois* (1972) 406 U.S. 682, 689 [32 L.Ed.2d 411, 417-418, 92 S.Ct. 1877].) His claim of impropriety here, however, rests upon two grounds: (1) an extended right to counsel under California law, and (2) the fact that he was already charged with similar crimes in San Mateo.

Very recently, the California Supreme Court held "that article I, section 15 of the California Constitution, affords to a defendant the right to counsel at a preindictment lineup." (*People* v. *Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927].) However, the court also concluded: "Nevertheless, because the *Chojnacky* court failed to reach a majority, the Courts of Appeal were compelled to decide that issue without guidance from this court; they decided against extending the right to counsel to preindictment lineups; police, prosecutors, and courts have placed extensive reliance upon these decisions. We believe that the rationale underlying prospectivity in *Cook* and similar cases applies in the present situation. Accordingly, with the exception of the present appeal, the holding in this opinion should apply only to lineups held after the date of finality of this opinion." (*Ibid.*)

Following the direction of our high court, we find that appellant, whose preindictment lineup was conducted well before the decision in *Bustamante, supra*, had no right to counsel at his pretrial physical lineup. The fact that he had been formally charged with separate crimes in another jurisdiction does not alter this result, since, in our

view, a suspect's right to counsel attaches to the proceeding in the jurisdiction in which the challenged prosecutorial action takes place.

■ Appellant also claims that the physical lineup was impermissibly suggestive, thereby rendering inadmissible not only the testimony of two witnesses, Brian Peterson and Ute Papendick, regarding that out-of-court lineup, but as well the in-court identification testimony of all attending witnesses.

Since the trial court upheld the physical lineup procedure, we are bound to sustain that ruling if supported by substantial evidence. (*People* v. *York* (1980) 108 Cal.App.3d 779, 786 [166 Cal.Rptr. 717].)

Upon consideration of the totality of circumstances, we find that the physical lineup was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" under the test applied by United States and California Supreme Court decisions. (*Simmons* v. *United States, supra*, 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253]; *Stovall* v. *Denno, supra*, 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206]; *People* v. *Blair, supra*, 25 Cal.3d 640, 659.)

The lineup itself—depicted in a photograph filed in the record as an exhibit—does not reveal that appellant was significantly distinguishable from the remaining eight subjects. We acknowledge that a number of the subjects were distinguishable from him with respect to some physical features; particularly that subject numbers 1, 2, 4 and 6 were taller than appellant. However, there is no requirement that a defendant in a lineup be surrounded by people nearly identical in appearance (*People* v. *York, supra*, 108 Cal.App.3d 779, 787; *People* v. *Burke, supra*, 102 Cal.App.3d 932, 940), and certainly there was no marked disparity between appellant and the others in the April 5 lineup, so as to set appellant apart or make him conspicuous.

In our view, the procedure employed was eminently fair. The witnesses were separated, told not to talk with each other, and to designate their identifications by writing the suspect's number on a card provided them. Appellant was allowed to pick the subjects to appear in the lineup from among jail inmates, review them, and then pick his spot in the line. Further, the witnesses testified that they were told to be very sure of their identifications. Moreover, the mixed results obtained—some witnesses identified appellant while others could not make an identifica-

tion—also tends to indicate the fairness of the physical lineup procedure.

We accordingly rule that substantial evidence supports the trial court's finding of a lawful pretrial physical lineup. (*People* v. *Burke, supra,* 102 Cal.App.3d 932, 940-941.)

■ Appellant complains that the trial court committed prejudicial error by refusing to instruct the jury, as requested by defense counsel, concerning the suggestiveness of pretrial identification procedures and the factors that affect eyewitness identification testimony, as they relate to reasonable doubt.[6] According to appellant, he was entitled to such instructions under the rule of *People* v. *Guzman* (1975) 47 Cal.App.3d 380 [121 Cal.Rptr. 69], wherein it was held that "a defendant is entitled to an instruction directing the jury's attention to evidence from the consideration of which reasonable doubt of defendant's guilt might be engendered." (*Id.,* at p. 387; see also *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Gomez* (1972) 24 Cal.App.3d 486, 490 [100 Cal.Rptr. 896].)

The trial court, however, did read the following instruction, CALJIC No. 2.91, to the jury: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him. If, from the circumstances of the identification, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

---

[6]Appellant proposed the following instructions which were rejected by the trial court:
No. 2. "In determining whether reasonable doubt exists in regard to the identification of the defendant, you should consider, among others, the following factors: [¶] Any evidence relating to a failure by a witness to identify the defendant on a prior occasion; [¶] Any evidence relating to whether a witness previously identified a person other than the defendant; [¶] Any evidence relating to any discrepancy between a witness' description of the perpetrator and the defendant's description; [¶] Any evidence relating to whether there was any suggestion of unfairness in a pre-trial identification procedure; and [¶] Any evidence relating to the lapse of time between the alleged act and the identification."
No. 3. "A line-up or photographic display, to be fair, should display persons who are similar in age, complexion, race, sex, physical features, and build. The persons displayed should have similar hairstyles, facial coloring, and facial hair. [¶] An identification procedure is not fair if the accused stands out in some way from the others."

The jury was also instructed, in the terms of CALJIC No. 2.20 concerning the credibility of witnesses, and CALJIC No. 2.22 as of weighing conflicting testimony.

In *People* v. *Guzman, supra*, 47 Cal.App.3d 380, the jury was not given the instruction embodied in CALJIC No. 2.91, and which was adopted pursuant to the holding in *People* v. *Gomez, supra*, 24 Cal. App.3d 486. The giving of CALJIC No. 2.91 distinguishes the present case from *Guzman*, and fulfilled the trial court's instructional obligations relating to identification testimony and reasonable doubt. (*People* v. *Hall* (1979) 95 Cal.App.3d 299, 313 [157 Cal.Rptr. 107].) Consequently, we find no error in the trial court's rejection of the further and superfluous instructions on this issue proposed by appellant. (*Ibid.*)

 Appellant next argues that evidence of three uncharged robberies of the Hilltop Liquor Store in San Mateo County was erroneously admitted at his first trial.

Over appellant's objection, the prosecution was allowed to elicit testimony from Gene Stengelini, owner of the Hilltop Liquor Store and victim of robberies which occurred there on February 19, 21 and 26, 1979. According to Stengelini, on each of those dates his liquor store was robbed by two unmasked robbers, one blond and one dark-haired. Stengelini identified appellant as the dark-haired robber. On each occasion, the robbers were armed, the victims were placed in a beer cooler during the course of the robbery, one of the robbers took Camel cigarettes, and the victims were told to count to 100 before leaving the cooler.

Evidence of these uncharged offenses—upon which appellant's convictions in San Mateo County were based—was admitted to prove identity and thereby corroborate the testimony of other witnesses. Appellant claims that the probative value of such evidence was not "legally acceptable," since it was outweighed by its prejudicial effect, thus rendering it inadmissible under the established rules of evidence.

Evidence Code section 1101, subdivision (a), provides generally that evidence which establishes a person's character or trait of character, such as evidence that a person has committed prior crime or acts of misconduct, is inadmissible when offered to prove conforming conduct on a specific occasion. However, subdivision (b) of section 1101 provides that character trait evidence in the form of prior wrongful acts is admissible to prove some fact other than a person's propensity to com-

mit a particular crime.[7] (*People* v. *Thompson* (1979) 98 Cal.App.3d 467, 474 [159 Cal.Rptr. 615].)

It is now well-established that evidence of prior acts is generally admissible if it bears upon the issue of identity. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Thomas* (1978) 20 Cal.3d 457, 465 [143 Cal.Rptr. 215, 573 P.2d 433]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 241-242 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Haslouer* (1978) 79 Cal.App.3d 818, 826 [145 Cal.Rptr. 234]; *People* v. *Whittington* (1977) 74 Cal.App.3d 806, 815 [141 Cal.Rptr. 742]; *People* v. *Hunt* (1977) 72 Cal.App.3d 190, 200 [139 Cal.Rptr. 675].) Since the question of identity was always an issue in the present case, the other offenses evidence was offered for a proper purpose here.

However, admission of other "crimes evidence" cannot be justified merely by asserting an admissible purpose; the question remains whether the particular evidence of defendant's other offenses has such relevance to the ultimate fact in dispute as to outweigh its prejudicial effect. (*People* v. *Thompson, supra,* 27 Cal.3d 303, 318-319; *People* v. *Guerrero* (1978) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366].) ■ In *People* v. *Thomas, supra,* 20 Cal.3d 457, 465, our high court noted that, "[t]he test of admissibility under the common design or plan exception is 'whether there is some clear connection between that [prior] offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other. Or as the matter is sometimes stated, the other offenses . . . are sufficiently similar and possess a sufficiently high degree of common features with the act charged where they warrant the inference that if the defendant committed the other acts he committed the act charged. . . .'" (See also *People* v. *Haslouer, supra,* 79 Cal.App.3d 818, 826; *People* v. *Whittington, supra,* 74 Cal.App.3d 806, 815.) Appellant claims that the incidents here in question do not bear the requisite similarity to each other to justify admission under section 1101, subdivision (b).

---

[7]Evidence Code section 1101 provides in pertinent part: "(a) [e]vidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specific occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

In ruling upon this issue, the court "'... must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proferred and satisfy itself that each link of the chain of inference between the former and the latter [offenses] is reasonably strong.'" (*People v. Thompson, supra,* 27 Cal.3d 303, 316.) Here, the issue is identity. Consequently, as explained in *People v. Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752], "[e]vidence of uncharged offenses is ordinarily admissible if it discloses a distinctive modus operandi common both to the charged and uncharged offenses. [Citations.]" (See also *People v. DeRango* (1981) 115 Cal.App. 3d 583, 588 [171 Cal.Rptr. 429].)

On the record before us, we readily conclude that the numerous common features shared by the charged and uncharged offenses satisfy the test for admissibility under section 1101, subdivision (b). The distinctive common marks or traits include: both businesses were liquor stores located on corner lots; two unmasked robbers, one dark-haired and one blond, perpetrated both robberies; both stores were robbed more than once in a short period of time; the robberies were committed during the early evening; store employees and customers were put into a beer cooler during the robberies; a dark gun was used by the robbers; when the robbers encountered difficulty opening the safe, the store clerk was ordered to assist them; customers' wallets and Camel cigarettes were taken in each of the robberies; and as the robbers were leaving, the victims were told to count to 50 or 100 before exiting the cooler.

We therefore find no error in the trial court's admission of testimony recounting the uncharged similar robberies.

Next, appellant asserts that the trial court committed a number of sentencing errors, the first of which is that his sentence of 21 years and 4 months improperly exceeded the double base term limitation of Penal Code section 1170.1, subdivision (f), which then read: "The term of imprisonment shall not exceed twice the number of years imposed by the trial court as the base term pursuant to subdivision (b) of Section 1170 unless the defendant stands convicted of a felony described in subdivision (c) of Section 667.5, or a consecutive sentence is being imposed pursuant to subdivision (b) of this section, or an enhancement is imposed pursuant to Sections 12022, 12022.5, 12022.6 or 12022.7 ...."

Appellant correctly submits that under *People v. Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396], armed robbery is not a

felony described in subdivision (c) of section 667.5, and notes that sentence was not imposed pursuant to subdivision (b) of section 1170.1. He further contends that the last provision of section 1170.1, subdivision (f) (prior to its amendment in 1980) permits an increase only to the extent of the additional time specified for the enhancement of the base term, and that, consequently, the maximum allowable term which could properly have been imposed by the trial court was 12 years: twice the base term (10 years) plus enhancements (2 years).

Appellant's argument was specifically rejected in *People* v. *Wright* (1979) 92 Cal.App.3d 811 [154 Cal.Rptr. 926], where the court ruled that given the term "unless" in subdivision (f), "The limit on the aggregate term is thus twice the base term *except* in three specified circumstances, the last of which (a § 12022 enhancement) is present here." (*Id.*, at p. 813.)

The court in *People* v. *Wright, supra*, 92 Cal.App.3d 811, 813, further found the language of Penal Code section 1170.1, subdivision (f) to be, variously, "quite simple," "unambiguous" and "clear," a conclusion which, with great respect, we are unable to share, since we think it to be, in context, both opaque and ambiguous.

In fact, we believe that a more reasonable construction of the subdivision is that the Legislature intended by it to ensure that prison terms for certain enhancements would be includible in the overall sentence, notwithstanding the double-base term limitation. To say otherwise is to conclude that the Legislature meant to equate a single enhancement with conviction of a violent felony, or a serious prison offense, or prison escape, as a justification for denying a criminal defendant the ameliorative effect of the double-base term enhancement. Thus, for example, the presence of a single enhancement under Penal Code section 12022.6 (taking property of great monetary value) would permit an otherwise *unlimited* number of consecutive prison terms. Or, as here, appellant's enhancements would result in an *additional* 9.4 years' imprisonment, and a prison term for robbery—to put the matter in perspective—10 times longer than the current (lower) term for manslaughter.

We do not think the Legislature intended this result.[8]

---

[8]This conclusion makes it unnecessary for us to consider appellant's two remaining assertions of sentencing errors by the trial court under Penal Code section 1170.1, subdivision (a). Even if either or both of those arguments were accepted, the reduction in appellant's sentence would not be as great as that necessary by application of the double base term limitation of section 1170.1, subdivision (f).

■ Appellant's final argument is that the trial court improperly punished appellant for exercising his right to a jury trial by imposing consecutive sentences following retrial. He notes that, after his first trial, the prosecution offered concurrent sentencing on the charges of which he was not convicted. Since no new evidence was offered, appellant reasons that the trial court, in effect, punished him for refusing the offer and proceeding to trial.

■ As appellant suggests, according to *In re Lewallen* (1979) 23 Cal.3d 274, 287 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823]: "A court may not, . . . impose a sentence that conflicts with a defendant's exercise of his constitutional right to a jury trial. [Citation.]" (See also *North Carolina* v. *Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072].) However, we find nothing in the record to indicate that appellant's sentence was increased to punish him for asserting his constitutional rights. And the mere fact that following trial a defendant receives a more severe sentence than was offered during plea negotiations does not in itself support the inference that he was penalized for exercising constitutional rights. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Angus* (1980) 114 Cal.App.3d 973, 989-990 [171 Cal.Rptr. 5].) ■ We are convinced after review of the record that the court properly exercised its sentencing discretion based upon the facts adduced at trial, and did not, according to the trial judge's own explanation, impose consecutive sentences to punish appellant for exercising his right to a jury trial. (*People* v. *Szeto, supra*, 29 Cal.3d 20, 35; *People* v. *Angus, supra*, 114 Cal.App.3d 973, 990.)

The judgment is affirmed. The case is remanded to the trial court for resentencing in accordance with the views expressed herein.

Racanelli, P. J., and Grodin, J., concurred.

A petition for a rehearing was denied December 15, 1981, and respondent's petition for a hearing by the Supreme Court was denied January 20, 1982.